ORIGINAL                           KOVNER, J

UNITED STATES DISTRICT COURT              GOLD, M.J.
EASTERN DISTRICT OF NEW YORK

                                          2020 JAN 31  PM 8: 12

Jan-Michael Rives

                    Plaintiff,

        -against-                         CV 20 - 621

SUNY DOWNSTATE COLLEGE OF MEDICINE,
LISA MERLIN, M.D.,
ANDREW ADLER, M.D.,
ROBIN OVITSH, M.D.,                       
JEANNE MACRAE, M.D.,
CARLOS PATO, M.D.,
JOSEPH MERLINO, M.D.
JEFFREY PUTMAN,
SOPHIE CHRISTOFOROU

                    Defendants.

Plaintiff as and for his Complaint, alleges upon information and belief as follows:

**PARTIES AND NATURE OF THE CASE**

1.  Plaintiff, Jan-Michael Rives, was a medical student at SUNY Downstate

    College of Medicine ("SUNY Downstate").

2.  Defendant, SUNY Downstate, is a public institution of higher learning located

    in Brooklyn, New York and a college of the State University of New York

    system. SUNY Downstate receives substantial federal funding.

3.  At all relevant times herein, Defendant, Sophie Christoforou ("Dean

    Christoforou") was and is the Associate Dean for Curricular & Student Affairs.

4.  At all relevant times herein, Defendant, Jeffrey Putman ("Dr. Putman") was

    the Vice President for Student Affairs & Dean of Students.

1

5. At all relevant times herein, Defendant, Andrew Adler ("Dr. Adler") was a Professor of Medicine.

6. At all relevant times herein, Defendant, Jeanne MacRae ("Dr. MacRae") was the Senior Associate Dean for Academic Affairs or the Acting Senior Associate Dean for Academic Affairs.

7. At all relevant times herein, Defendant, Robin Ovitsh ("Dr. Ovitsh") was the Assistant Dean for Clinical Competencies.

8. At all relevant times herein, Defendant, Carlos Pato ("Dr. Pato") was the Dean, College of Medicine.

9. At all relevant times herein, Defendant, Joseph Merlino ("Dr. Merlino") was the Vice President for Faculty Affairs & Professional Development.

10. At all relevant times herein, Defendant, Lisa Merlin ("Dr. Merlin") was the Unit director of "Mind, Brain and Behavior" (Unit 6) and the director of the Clinical Neuroscience Pathway.

11. This action is action for equitable relief and monetary damages to redress Defendants' unlawful discrimination against Plaintiff and dismissal of Plaintiff from SUNY Downstate based upon his cognitive disability, in violation of the Rehabilitation Act of 1973 (RHA) and the Americans with Disabilities Act (ADA); retaliation for requesting accommodation, in violation of the ADA; discrimination based on gender/sex, in violation of Title VII of the Civil Rights Act of 1964; denial of due process, in violation of the 14th amendment of the Constitution of the United States; breach of contract; negligent infliction of emotional distress; and other claims as may apply to the facts stated herein.

12. Specifically, during the course of Plaintiff's study at SUNY Downstate, the Defendants discriminated against Plaintiff because of his cognitive disabilities by failing to provide him reasonable accommodations and dismissing him from SUNY Downstate. SUNY Downstate also refused to engage in an interactive dialogue to determine the feasibility of his requested reasonable accommodations. Moreover, SUNY Downstate, and its administration, including but not limited to the Individual Defendants, maintained a hostile learning environment riddled with discriminatory intimidation, retaliated against Plaintiff for requesting accommodation, and dismissed Plaintiff for unprecedented reasons, without due process.

**JURISDICTION**

13. Jurisdiction in this Court arises under 28 U.S.C. §1331 and §1343.

**VENUE**

14. The unlawful practices described below were committed within the State of New York, County of Kings, and Defendant SUNY Downstate resides in this judicial district. Accordingly, the venue lies in the United States District Court for the Eastern District of New York.

**BACKGROUND**

15. Plaintiff was accepted into SUNY Downstate's M.D. degree program in March of 2014 and commenced his course of studies within that program in August of 2014.

3

16.    Plaintiff suffers from ADHD and intermittent depression.

17.    During the course of Plaintiff's study, the Plaintiff was discriminated against because of his disability, and was retaliated against for requesting accommodations.

18.    During Plaintiff's leave of absence, Defendants repeatedly set up obstacles to his returning to school by failing to provide reasonable accommodations, prompt clarification of requirements of the leave of absence, and ultimately denied the Plaintiff readmission making false claims about the terms of the leave.

19.    As a result of their egregious conduct, Defendants violated federal and state disability laws. Defendants also caused Plaintiff pain and suffering, mental and emotional anguish and trauma, damage to reputation, and economic damages.

20.    The M.D. program is a four-year course of study, divided into two phases, the "Foundations of Medicine" years and the "Clinical" years. Although preclinical medical education in the United States traditionally comprises a full two years, SUNY Downstate adopted a new curriculum in 2013 that compressed the preclinical phase into just 18 months, such that the clinical phase would begin approximately halfway through a student's second year and continue through the end of the fourth year. The "Foundations" phase therefore comprises the courses and requirements of the first 1.5 years of study, including Units 1 through 6 and Gateways 1 and 2.

21.   Unlike a traditional curriculum, in which assessment is usually spread across several mid-term and final exams in each unit, SUNY Downstate's new curriculum compresses all graded exams into one week at the end of each Unit and an additional week of exams during each "Gateway". These exams are of various modes (multiple choice, short-answer, essay, oral, practical, etc.) and there is usually more than one exam per day.

22.   Gateways are a component unique to SUNY Downstate's new curriculum, not employed by other US medical schools. Indeed, the 2014-2015 edition of the Student Handbook declared that, "The definition and purposes of the Gateways is being further developed by the Student Assessment Committee." This line was removed from the handbook the following year without comment or further explanation of what the Gateways are actually meant to accomplish.

23.   Exams are associated with one or more of six "Competencies" (e.g., Patient Care, Medical Knowledge, Interpersonal and Communication Skills, etc.). Importantly, an "Identified Deficiency" (ID) in *any* of the six Competencies results in failure of the entire Unit or Gateway, regardless of performance in other exams.

24.   In addition to lectures, for which attendance is *not* mandatory, the curriculum includes a large number of "small-group activities" for which attendance *is* mandatory. Often, these small-group activities required students to teach themselves and each other material with which they were unfamiliar, without any help or supervision from the faculty.

**STATEMENT OF FACTS**

25.   On September 22, 2014 (Fall 2014 / Unit 1), I was absent from the day's
scheduled activities because of the sudden death of his girlfriend's brother.
The same day, I emailed the Unit Director, Dr. Keith Williams ("Dr. Williams"),
letting him know the reason for my planned absence that day and asking Dr.
Williams to: *"please forward this email to the appropriate persons at
Downstate, as I'm unsure who I should contact."* In addition to Dr. Williams, I
emailed my two anatomy lab partners about my planned absence.

26.   Later that day, Dr. Adler emailed me, alleging that I had not notified him, that
he had to find out the reason for my absence from my classmate, and that I
should in the future contact "[him], i.e. the faculty" in these circumstances. I
replied that I had in fact reached out to a faculty member, and I forwarded him
the email I had sent to Dr. Williams.

27.   The following day, on September 23, 2014, Dr. Adler confronted me about not
having reached out to him directly. Although I apologized, it was clear from
his tone that he was still unhappy about it.

28.   On October 10, 2014, I received two separate end-of-Unit 1 reports. The first
did not include any feedback from Dr. Adler, while the second report, received
some hours later, included the following feedback from Dr. Adler: "Although
you have had reasonable explanations for some of the lapses in meeting
course responsibilities, in each case you did not communicate in advance
with faculty to notify us of a problem."

29.    On October 22, 2014, I met with John Lewis ("Dr. Lewis"), the then-Associate

Dean for Foundations of Medicine. In this meeting, Dr. Lewis informed me

that Dr. Adler's feedback on the end-of-unit report had initially been even

harsher; that Dr. Adler was very displeased that I had not contacted him

directly on the day of my absence; that Dr. Adler had initially tried to fail me in

Unit 1 for a deficiency of Medical Professionalism because I had not

contacted him; and that the rest of the faculty had to fight Dr. Adler quite hard

and reiterate that I had made an effort to notify him before Dr. Adler finally

relented and agreed to moderate his criticism and not fail me.

30.    Puzzled by Dr. Adler's seemingly irrational zeal to discipline me over the

matter, Dr. Lewis asked me whether I had done anything else to upset him. I

replied that I had been late to his sessions a number of times, due mainly to

my having to commute from well over an hour away (taking three trains), and

the inherent vagaries of the New York subway system. Dr. Lewis suggested

that, unfortunately, the simplest solution would probably be to move closer to

campus. I agreed and began renting a small room nearby at considerable

expense, only returning to my apartment in Manhattan when time permitted.

Ultimately, I passed all of my first-year courses and completed Gateway 1.

31.    On July 1, 2015, at the end of the first year, I was notified that I had failed

Gateway 1 due to an Identified Deficiency (ID) in the domain of "Interpersonal

and Communication Skills" (ICS). This was due to my alleged failure of a

"Standardized Patient Interaction". Performance in these Standardized

Patient Interactions was determined subjectively, by Dr. Adler, based on video recordings of the interactions.

32. Although I remediated the failure, I had major concerns that I had not been graded fairly by Dr. Adler. I took my concerns to several of the Defendants, including Dr. Ovitsh, Dr. Granat, Dr. Putman, Dr. Merlino, in each case reiterating that Dr. Adler did not like me personally, and that his criticism of my performance was unfounded and biased. I went as far as asking to file a formal appeal with Dr. Jeanne Macrae, the Senior Associate Dean for Academic Affairs.

33. Although the student handbook states that: "If a student wishes to appeal a grade received in a particular course, the student should first attempt to resolve the matter by meeting with the Unit director. If the student is not satisfied after attempting such resolution, s/he may file a formal written appeal to the Associate Dean responsible for that segment of the curriculum," Dr. MacRae told me that there was in fact no formal appeal process for Gateway grades. Hers was the final word, and after reviewing my performance, she declined to overrule Dr. Adler.

34. Early in my second year, I visited the office of Dr. Merlin, the Unit director of "Mind, Brain and Behavior" (Unit 6). She and I had had, up to that point, an excellent relationship, and I believed I could come to her for help.

35. I told Dr. Merlin that I had struggled throughout the first year with memory/cognitive difficulties. She referred me to Dr. Stanley Cristal, a neurologist whose office was just down the hall from her own.

36.     Prior to the start of Unit 6, I again visited Dr. Merlin. I reiterated how much I was struggling with the curriculum given my cognitive difficulties, especially in the context of group learning, and that the numerous mandatory activities imposed by the curriculum left me with very little time to study at home, and even less time to sleep. I asked her if she could help me get out of some of the group activities, i.e. obtain an accommodation for my disability.

37.     Dr. Merlin said that she didn't have that power, and that if I was struggling so much, then perhaps I shouldn't be in medical school. She said I should consider withdrawing from medical school and applying to the PhD program, because I was "clearly very intelligent." At no point did she suggest I request a disability accommodation from the Office of Student Affairs, though she had a duty to do so.

38.     On January 12, 2016, halfway through Unit 6, I met with Dean Christoforou. She told me that some unnamed members of the faculty were concerned that I might have a major mental illness, perhaps schizophrenia. I assured her that I was not schizophrenic. I also expressed how much I was struggling with learning under the new curriculum and getting very little sleep as a consequence, perhaps explaining why I seemed "off" to some of the faculty.

39.     On January 15th, 2016 I received an email from Dr. Riccardo Bianchi indicating that I had one unreported absence at the halfway point of Unit 6, and that a second unreported absence would lead to an automatic ID in Medical Professionalism and failure of Unit 6. By the time he sent this email, I

9

had already accumulated a second unreported absence (on January 12, 2016), and thus I would automatically fail Unit 6.

40.  Near the end of Unit 6, I sent an email to Dr. Merlin in which I again referred to my struggles with learning in a group setting. Dr. Merlin did not reply to this email, but instead forwarded it to the entire class of 2018, my classmates. She did not acknowledge or apologize for this.

41.  On February 2nd, 2016, I was informed that I had failed Unit 6 due to an ID in Medical Professionalism. According to the Student Handbook, if a student is struggling, someone from the school "will offer to meet with [that student] at the mid-Unit time point and help them develop a plan to improve performance before it gets to the level of failure necessitating remediation." This was not done in my case.

42.  On February 24th, 2016, I met with the Professionalism Assessment Committee to begin the process of remediating the failure of Unit 6. In the meeting, Dr. Putman noted that, although faculty said I really seemed to struggle at the beginning of the unit, by the end of the unit I had turned it around and actually did well academically. He asked what changed. I told him I had found another medical school's lectures online about halfway through the unit, and had been studying from those rather than the curriculum at Downstate.

43.  I once again made it clear that I struggle terribly with learning in a group environment, and that the new curriculum just doesn't work for me. Dr. Madiha Akhtar interrupted me, saying, "Well, I have a problem with that," and

that I had to be able to adapt to a different way of learning. At this point Dr. Putman asked Dr. Merlino if he would be willing to take charge of my remediation, which he agreed to do.

44. Remediation of the ID in Medical Professionalism involved outlining a Professional Learning Plan ("PLP") that addressed, among other questions, the following: "Acknowledging that the curriculum is the way it is, can you describe how you might be getting in your own way?" I was also asked to meet with my psychiatrist, Dr. Alan Kouzmanoff, who also helped me in putting together the PLP. I submitted the completed PLP form on March 9th, 2016.

45. The following day, on March 10th, 2016, I received a phone call from Dean Christoforou in which she informed me that I had failed Gateway 2 and that the Academic Progress Committee had convened and dismissed me from the school, effective immediately.

46. To be clear, at no point before being told I was dismissed was I warned that such action was being considered. Nor would I have been able to take any corrective action had I been warned, since I had already completed Gateway 2 even before being notified of my failure of Unit 6.

47. I was never placed on academic probation. From the first day of class to my last exam, I was a student in good academic standing. Then, without notice or opportunity to address the committee, I was suddenly dismissed, without any due process.

48. The 2014-2015 Student Handbook does not indicate that failure of more than one Gateway is sufficient cause to consider dismissal. For the 2015-2016 Student Handbook, the relevant section was modified to make dismissal a possibility in such a case.

49. On March 11th, 2016, I met with Dean Christoforou and Dr. Ovitsh to discuss my dismissal. Dean Christoforou told me that I had failed Gateway 2 due to IDs in the Patient Care Competency and the Interpersonal Communication Skills competency. I was never given the opportunity to appeal my Gateway 2 grade nor given any explanation of why I failed those components of Gateway 2.

50. Dr. Ovitsh asked me whether I had considered doing a PhD. I said I had considered applying to the MD/PhD program, at which point she interrupted me, saying, "I'm not talking about an MD/PhD, just a PhD." I replied that I was not interested in pursuing only a PhD. I asked whether any appeal of my dismissal was possible. Dr. Ovitsh grudgingly admitted that I could formally appeal the decision if I really wanted to.

51. I then asked Dr. Ovitsh whether Dr. Merlin had been part of the committee that voted to dismiss me. She said that she had indeed been present and agreed with the decision. I asked, "was anyone fighting for me?" She replied, "That's why we're giving you this opportunity to appeal. This is your chance to fight for yourself."

52. I later visited Dr. Merlin's office to ask her whether it was true that she had voted to dismiss me. Dr. Merlin confirmed that she had voted to dismiss me,

and added, "I don't think we've ever dismissed a student for the reasons you were dismissed." When I asked why, given our previous good relationship, she voted to dismiss me, she replied that she had had a very favorable impression of me until I came into her office saying that the group activities are "useless" and asking to be accommodated. She grew increasingly hostile throughout the encounter, finally rising from her chair and waving me out of her office.

53. Dr. Merlin later dismissed me from the Clinical Neurosciences Pathway, falsely claiming that it was because I had failed Unit 6. Dr. Merlin believes that anyone with any sort of mental illness, even depression, should not be a medical doctor. Dr. Merlin holds views that are blatantly discriminatory and highly irregular, particularly for someone in her position. Her beliefs are well-known to SUNY Downstate's faculty and administrators.

54. Dr. Merlino seemed to take pity on me when I told him I had been dismissed, and he invited me to meet with him in his office on March 21, 2016 to discuss my appeal. He later changed the location of the meeting to his own apartment.

55. On March 21, 2016, Dr. Merlino and I spoke in the den of his apartment, alone, for approximately 30 minutes. I was clearly depressed. He suggested that we meet again in his office before the appeals committee meeting.

56. In that subsequent meeting with Dr. Merlino, we again discussed the difficulties I was experiencing. I told him that I seemed to become irritable under stress and that the only thing that had ever changed that was taking the

antidepressant Wellbutrin, but that I had stopped taking it because I thought it contributed to my memory problems. I asked him what I should do and he told me I needed to get back on Wellbutrin.

57.   I called Dean Christoforou and asked her to push back the appeals committee meeting until I could recover mentally. In the meantime, I met with my psychiatrist and started taking Wellbutrin again.

58.   On March 30th, 2016, I met with the Student Appeals Committee. Among the materials that I submitted to the committee was a letter from my psychiatrist stating that I had been treated by him "since 2010 for ADHD and intermittent Depression" and that "Because of his condition, he has had to struggle to get where he is. He is often tired because it takes him longer to process all the information he has to absorb for medical school and has to spend more time studying than others. He has also had to change or discontinue medications several times since beginning medical school because of side effects."

59.   During the appeal meeting, I explained to the committee that I had struggled to learn in the group activities emphasized in the new curriculum as I suffered from an attention disorder. This was not the first time the school heard about my condition, however. In fact, in my medical school application essay I mentioned that I had an attention disorder for which I was receiving treatment.

60.   I also explained during the appeal meeting that although I had suffered from depression, I was taking medication for it and that I had felt a significant improvement already.

61. A few hours after the meeting, I received a call from Dr. Putman, informing me that my appeal was successful and that I had been put on a medical leave of absence for one year. Although I had not wanted or asked for a medical leave of absence, I was in no position to complain, so I accepted the terms that the committee set out.

62. On April 4th, 2016, I received an email from Dr. Putman outlining the terms of my appeal and readmission.

63. One of the conditions I had to meet before being readmitted was that I must take the USMLE Step 1 exam by October 31st, 2016. A later part of the letter read, "Should you fail either Step 1 or any part of the Gateway 2 re-examinations, you will be considered for dismissal from the College of Medicine."

64. On June 7th, 2016, I mentioned to Dean Christoforou that Wellbutrin was no longer working as well as before, that I had increased the dose, and that if that did not work, I might try changing medications. In her reply, Dean Christoforou noted that "If your meds need to be changed, it may delay your study period."

65. Realizing that my preparation for Step 1 was proceeding slower than expected, on August 2nd, 2016, I wrote to Dean Christoforou asking to discuss my timeline for taking the Step 1 exam. This email went unanswered, as did my phone calls to her.

66. I reached out to Dr. Merlino and asked him to tell Dean Christoforou that I needed to talk to her about extending the deadline for me to take the Step 1

exam. He agreed and arranged a meeting with me in which Dean Christoforou would be present.

67. On August 24th, 2016, I met with Dr. Merlino and Dean Christoforou and asked for an extension to December 2016 or January 2016. Dean Christoforou was not initially in favor of granting an extension, saying "other students did not get *six months* to study for Step 1". Eventually, she offered a small extension, moving the deadline to the week of November 21, 2016, but said she would have to confirm it with the committee.

68. At this same meeting, it was explained to me by Dr. Merlino that as a condition of my appeal, I needed to meet regularly with someone from the student counseling center, and Dr. Christine Saunders-Fields was suggested.

69. After Dean Christoforou left the meeting, I was left alone with Dr. Merlino in his office. We spoke for a few minutes and then as I was getting up to leave, he said to "keep in touch," and "I like looking at your face." As he said this, he caressed my left cheek with his right hand.

70. I excused myself and left. Although it was clear that he had made a pass at me, I did not report this incident of sexual harassment to anyone at the time, as I did not want to cause problems for Dr. Merlino, who I considered a friend.

71. Later that day, I emailed Dr. Saunders-Fields to schedule an appointment as instructed. She did not reply until September 6th, 2016 *(i.e. two weeks later)*. In her reply, she initially claimed that she could refer me to outside counseling, but she would not be able to see me herself, as "student counseling is for students currently attending [SUNY Downstate]."

16

72.   Later, after some discussion between herself and Dean Christoforou, Dr.

Saunders-Fields agreed to see me, and I met with her on September 12th,

2016. At our meeting, she asked me questions from a diagnostic

questionnaire for depression. After completing the questionnaire, Dr.

Saunders-Fields informed me that, according to the results, I was depressed.

73.   I emailed Dean Christoforou on September 9th, 2016 and again on September

16th, 2016 asking whether my extension had been confirmed, since the

October 31st deadline was getting closer. Not receiving a prompt answer from

her, I asked Dr. Merlino whether I should go ahead and register for the Step 1

exam for the week of November 21st. He said that if I had not received

confirmation from Dean Christoforou, then I should register to take the exam

by the original deadline of October 31st.

74.   I knew I would not be ready to take the exam by the original deadline, so I

waited to receive confirmation from Dean Christoforou. She did not respond

to my calls or email until October 4th, 2016, at which time she confirmed the

extension she had offered me at the meeting *a month and a half* earlier. I

scheduled my exam for November 23rd, 2016.

75.   On November 22nd, 2016, I emailed Dean Christoforou because I was not

confident that I would pass Step 1 if I took it the following day as scheduled.

Dean Christoforou declined to offer another extension, and stated that if I did

not take the exam as scheduled, "we will have to set up another meeting with

the Student Appeals Committee to re-review your status and the reasons you

could not take the exam during the time allotted."

17

76.   I replied to Dean Christoforou and Dr. Putman, asking whether, in their opinion, the appeals committee would not allow me to continue at SUNY Downstate if I did not take the exam as scheduled. I also asked whether, in their opinion, if I did take Step 1 and failed it, the committee would decide the same. I received no response.

77.   I rescheduled my exam to December 29th, 2016 and emailed Dean Christoforou, Dr. Putman, and Dr. Merlino to tell them I had done so. I heard nothing further from them for almost two weeks.

78.   I met with the Student Appeals Committee on December 15th, 2016. Due to my increasing depression, I was unable to properly prepare for the meeting. I had no prepared statement. I came to the meeting looking disheveled, wearing purple ankle-high socks, dark jeans, a tee shirt, a jacket, and no tie. It should have been evident to any trained psychiatrist (there were several in attendance) that I was in no condition to defend myself.

79.   At the meeting, the head of the committee was very critical of my decision to reschedule the exam.

80.   I explained that I thought there was a significant chance that I would fail the exam if I had taken it as scheduled, so that I would have found myself in a worse position, forced to meet with the same appeals committee and having failed Step 1.

81.   The head of the committee then read from the letter setting out the conditions of my appeal, and claimed that I was merely required to take--not pass--Step 1 by the deadline. Not having the letter in front of me, I took his claim at face

value and apologized to the committee for misunderstanding the terms they had set. Rattled by the hostility of the committee and my alleged erroneous understanding, I asked for mercy, excused myself, and left.

82.    As I left, I said to Dr. Putman, "That could have gone better." He nodded, and told me he would call me that night with their decision. Minutes later, as I was leaving the building, I saw one of the faculty members from the committee also leaving. Evidently, they did not deliberate for long. Dr. Putman called me that night and asked me to meet with him the following day.

83.    I met with Dr. Putman and Dr. Merlino the following day. They informed me that the committee had rescinded their prior decision, and that I would not be readmitted. I asked if the committee realized that they were ruining my life. Dr. Merlino responded that, "I think you're not taking responsibility for what you did." He added that since I seemed to have trouble dealing with authority, I would be better suited to being an entrepreneur.

84.    On December 27, 2016, I emailed Dr. Putman, asking to appeal directly to Dr. Carlos Pato, the Dean of the College of Medicine. I did not receive a reply from Dr. Putman until January 10, 2017, nearly two weeks later.

85.    I met with Dean Pato on January 23rd, 2017, and explained my situation as best I could. He said, "It sounds like, ironically, you would have been in a better position if you had taken Step 1 and failed." I agreed that that seemed to be the opinion of the committee, but that it was not my understanding when I chose to reschedule my exam. Dean Pato said he would make some inquiries and get back to me.

86.  After one week, I asked Dr. Putman whether the Dean had made a decision. On February 1st, 2017, Dr. Putman sent me the Dean's response in a letter dated January 31st, 2017. The Dean refused to override the committee's decision. According to the Student Handbook, the decision of the Dean is final.

87.  In fact, the committee had erred, as the letter they had written outlining the conditions for my return did in fact include the stipulation that, "Should you fail either Step 1 or any part of the Gateway 2 re-examinations, you will be considered for dismissal from the College of Medicine." I did not realize this until I looked at the letter again, more than two years later.

88.  That no one on the Student Appeals Committee, in the Student Affairs office, or in the Dean's office ever noticed that such a stipulation was indeed to be found in the letter suggests, at a minimum, that the decision to dismiss me was not careful and deliberate. The speed with which the committee arrived at their decision suggests the same.

89.  As a result of the above, I sustained enormous financial and emotional harm. I developed agoraphobia and did not leave my apartment for months at a time. My depression became debilitating. I did not speak to my family or friends for months at a time. Even now, I am unemployed. I have no career prospects in the field to which I dedicated the past decade of my life. I have student loan debt in excess of $200,000. My credit is ruined.

**JURY DEMAND**

90. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff does hereby demand a jury trial in this action.

**PRAYER FOR RELIEF**

WHEREFORE the Plaintiff respectfully requests that the Court issue judgment for Plaintiff as follows:

A. Enjoining Defendants and their respective officers, successors, assigns, employees and all persons in active concert or participation with them, from engaging in a practice that discriminates on the basis of disability or perceived disability;

B. Enjoining Defendant Pato, in his capacity as Dean of the College of Medicine, to reinstate Plaintiff as a student in the M.D. degree program; to restore all his credits and status as a student in good standing; to remove any barriers to re-enrollment in and transfer to accredited medical schools within the United States of America;

C. Awarding compensatory and punitive damages to the extent permitted under the Rehabilitation Act, the Civil Rights Act, the Americans with Disabilities Act and all other statues, but in an amount of not less than Ten Million Dollars;

D. Awarding Plaintiff his reasonable attorney fees, expert fees, and other costs of this action; and

E. Awarding such other and further relief as is appropriate and equitable.

DATED:   New York, New York

January 31, 2020

Jan-Michael Rives

Plaintiff

465 West 51st Street, Apartment 1E

New York, New York 10019

(917) 573-5249

jan.michael.rives@gmail.com